UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

    Plaintiff,

- against -

$39,421.00 in U.S. Currency and One
2008 Honda Accord, VIN 1HGCP26498A094823,

    Defendants.

-----------------------------X

Civil No. __JFM14-CV3842__

## VERIFIED COMPLAINT FOR FORFEITURE

Plaintiff, United States of America, by its attorneys, Rod Rosenstein, United States Attorney for the District of Maryland, and Stefan D. Cassella, Assistant U.S. Attorney, brings this complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

### NATURE OF THE ACTION

1. This is a civil forfeiture action against U.S. currency involved in violations of the Controlled Substances Act that is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6), and against a motor vehicle that is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(4).

### THE DEFENDANTS IN REM

2. The defendants are $39,421.00 in U.S. Currency and One 2008 Honda Accord, VIN 1HGCP26498A094823.

3. The defendant property was seized incident to a traffic stop that occurred in Worcester County, MD in the vicinity of Route 113 and Public Landing Road on April 27, 2014.

## JURISDICTION AND VENUE

4. Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendant property. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, over an action for forfeiture under 28 U.S.C. § 1355(a), and over this particular action under 21 U.S.C. § 881(a)(6) and (4).

5. This Court has *in rem* jurisdiction over the defendant property under 28 U.S.C. 1355(b). Upon the filing of this complaint, the plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which the plaintiff will execute upon the property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

6. Venue is proper in this district pursuant to 28 U.S.C. §1355(b)(1), because the acts or omissions giving rise to the forfeiture occurred in this district and pursuant to 28 U.S.C. § 1395 because the property was located in this district before being deposited into the Seized Asset Deposit Fund.

## BASIS FOR FORFEITURE

7. The defendant currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it was money furnished and intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act, constituted proceeds traceable to such an exchange, and was used and intended to be used to facilitate such violation.

8. The defendant vehicle is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(4) because it was use and intended to be used to transport and to facilitate the transportation, sale, receipt, possession and concealment of a controlled substance.

## FACTS

9. The forfeiture is based upon, but not limited to, the evidence outlined in the attached Declaration of Special Agent Kenneth W. Oland, Jr, Homeland Security Investigations, which is incorporated herein by reference.

WHEREFORE, the plaintiff prays that all persons who reasonably appear to be potential claimants with interests in the defendant property be cited to appear herein and answer the complaint; that the defendant property be forfeited and condemned to the United States of America; that upon Final Decree of Forfeiture, the United States Marshal dispose of the defendant property according to law; and that the plaintiff have such other and further relief as this Court deems proper and just.

Dated:   December 9, 2014

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By: _____
Stefan D. Cassella
Assistant United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800

3

## **DECLARATION**

This affidavit is submitted in support of a complaint for forfeiture of $39,421.00 in United States Currency and the seizure of the 2008 Honda Accord VIN #1HGCP26498A094823.

I, Kenneth W. Oland Jr, Special Agent of the Homeland Security Investigations, submit that there are sufficient facts to support a reasonable belief that:

- The $39,421 in United States currency constitutes (1) money, negotiable instruments, securities and other things of value furnished and intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; (2) proceeds traceable to such an exchange; and (3) money, negotiable instruments, and securities used and intended to be used to facilitate a violation of the Controlled Substances Act in violation of 21 U.S.C. § 841 and thus is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

- The 2008 Honda Accord VIN #1HGCP26498A094823 constitutes a conveyance, including aircraft, vehicles, or vessels, which is used, or was intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of property described in paragraph (1), (2), or (9) of 21 U.S.C. §881 and thus is subject to forfeiture pursuant to 21 USC §881(a)(4).

a. On April 27, 2014, Corporal Goddard of the Worcester County Sheriff's Office stopped a 2008 Honda Accord, North Carolina license plate BKY7070, ("the Accord") for a speeding violation in Worcester County, Maryland.

b. Cpl. Goddard identified Trezith Rashad Smart ("Smart") as the driver of the Accord.

c. During the course of the traffic stop, Cpl. Goddard noted that Smart avoided making eye contact with Cpl. Goddard and Cpl. Goddard detected the odor of marijuana coming from inside the passenger compartment of the vehicle.

d. Cpl. Goddard contacted Cpl. Ramey of the Worcester County Sheriff's Office to provide assistance with a probable cause search of the vehicle.

e. Just prior to Cpl. Ramey arriving to Cpl. Goddard's location, Cpl. Goddard had Smart exit the vehicle and meet Cpl. Goddard at the trunk area of Smart's vehicle. Cpl. Goddard advised Smart that Cpl. Goddard smelled marijuana in Smart's vehicle and that Cpl. Goddard would

be searching Smart's vehicle. Cpl. Goddard asked Smart when the last time he smoked marijuana in the vehicle was, and Smart stated he did not smoke marijuana. Cpl. Goddard then asked Smart if he had any friends recently in his vehicle that might have smoked marijuana and he stated once again "I don't smoke marijuana".

f.  Cpl. Goddard patted Smart down for officer safety. While Smart was out of the vehicle and talking to Cpl. Goddard he could tell by Smart's voice that he was becoming more and more nervous. As Smart spoke to Cpl. Goddard his voice seemed to be quivering and shaking. Smart started looking around and he would not make eye contact with Cpl. Goddard outside of his vehicle. As Cpl. Goddard spoke with Smart, Cpl. Goddard continually advised Smart to keep his hands to his side and he continually kept putting his hands in his front pants pockets and towards his back. As Cpl. Ramey walked up to Cpl. Goddard and Smart, for officer safety reasons Cpl. Goddard decided to detain Mr. Smart in handcuffs due to Smart not keeping his hands out of his pockets and from the back area of his pants.

g.  Officer Titterance of the Snow Hill Police Department arrived on scene of the traffic stop and he stood with Smart as Cpl. Ramey and Cpl. Goddard searched the vehicle. As Cpl. Ramey was approaching the vehicle to begin the vehicle search, Smart stated "it's in the center console".

h.  At approximately 1244 hours, the vehicle search was started. Cpl. Ramey opened the console under the front seat armrest and observed a silver handgun and an amount of United States Currency.

i.  At 1248 hours, Cpl. Goddard verbally advised Smart of his Miranda rights verbatim from a Worcester County Sheriff's Office Miranda rights form. Cpl. Ramey was present and

witnessed Cpl. Goddard advise Smart of his Miranda rights. Smart advised Cpl. Ramey and Cpl. Goddard that he understood his rights.

j. Cpl. Ramey advised Smart that she found the handgun and he stated it was loaded, it was his, and he bought it on the street for $125.00. Cpl. Ramey checked the handgun to see if it was loaded and she discovered that the handgun was loaded to capacity with six rounds in the magazine and one round in the firing chamber for a total of seven rounds. The handgun was a North American Arms .32 caliber, Guardian model, Serial # AD 00525.

k. While Cpl. Goddard was still searching the vehicle, Cpl. Goddard opened the glove compartment of the vehicle. Cpl. Goddard observed a blue plastic Wal-Mart bag that contained several bundles of United States Currency. Cpl. Goddard asked Smart how much currency was in the bag and he stated about $40,000.00. In the center dash board console, below the CD/Radio Cpl. Goddard located a knotted clear plastic bag that contained a green and brown vegetable matter substance that Cpl. Goddard recognized as marijuana THC.

l. Continuing with the search, Cpl. Goddard observed two cell phones in the front passenger seat of the vehicle, a red three (3) gallon gas container full of gasoline on the rear passenger side floor board, and a black hooded sweatshirt on the back passenger seat. Cpl. Ramey and Cpl. Goddard did not observe anything else in the vehicle. Cpl. Ramey and Cpl. Goddard did not observe a travel bag and or other personal items in the vehicle that would indicate that Smart was going to stay anywhere over night or for a few days.

m. Due to the large amount of United States Currency located in the vehicle, Cpl. Goddard requested the Worcester County Criminal Enforcement Team to be contacted and to assist with the currency seizure.

n. Cpl. Goddard transported Smart to the Worcester County Sheriff's Office to be processed on the possession of marijuana and the handgun in vehicle violations. While at the Worcester County Sheriff's Office, Cpl. Ramey used her drug detection canine K9 "Karma" to conduct a narcotics scan/sniff of the US currency. Cpl Ramey advised Cpl. Goddard that Karma demonstrated a positive response/alert for the presence of a controlled dangerous substance odor on the US currency.

o. Corporal Wells and Detective Johns of the Worcester County Criminal Enforcement Team arrived at the Worcester County Sheriff's Office, took custody of the United States currency and cellular phones located in the vehicle and interviewed Smart.

p. Cpl. Goddard noted to Det. Johns that the following items were seized during the search.

   1. One plastic bag containing Marijuana (less than ten grams) located in a compartment under the radio.

   2. One North American Arms brand, Guardian model, .32 caliber handgun (Serial number: AD00525) located in the center console. The handgun was loaded with one live .32 caliber round in the chamber. Also, the magazine was loaded to capacity with six live .32 caliber rounds which was inserted into the handgun.

   3. $39,000 dollars in U.S. Currency inside a blue "Food Lion" grocery bag located in the glove compartment. This $39,000 dollars was in twenty-one separate stacks that were folded and banded by rubber bands. Eighteen of the stacks contained $2,000 dollars and three stacks contained $1,000 dollars. The eighteen stacks of $2,000 dollars each had a handwritten "2K" marking on the outside bill of each stack. The three stacks of $1,000 dollars each had a

      handwritten "1K" marking on the outside bill of each stack. These handwritten markings were in black from an ink pen.

    4. $421 dollars in U.S. Currency located in the center console.

    5. One (1) Apple brand iphone, white in color, located on the front passenger's seat.

    6. One (1) Samsung brand, Galaxy S model, Verizon Wireless, black in color cellular telephone located on the front passenger's seat.

q. At approximately 1515 hours, Cpl. Wells and Det. Johns interviewed Smart at the Worcester County Sheriff's Office. During the interview, Smart advised the following:

r. Smart indicated he resides at 111 Coston Lane, Edenton, North Carolina and he was traveling from Edenton, NC to his girlfriend's residence located in Philadelphia, Pennsylvania. Smart advised that his girlfriend's name is Kia Finn, a 32 year old female. Smart later advised that he was not sure if her last name was Finn or Ginn after Cpl. Wells told Smart that he had checked and could not locate a Kia Finn in Philadelphia. Smart advised that he did not know the address of Finn's residence in Philadelphia. Smart advised that he met Finn on the internet, has been in a relationship with Finn for approximately one year and has traveled to her residence in Philadelphia approximately ten times in the past. Smart advised that he was planning to visit Finn for the majority of the trip and then planned to visit his father, Donald Smart in New Jersey for 2 or 3 days prior to returning home.

s. Cpl. Wells asked Smart if he had any clothes at his girlfriend's house. Smart advised that he had "three pair of pants and three shirts". Cpl. Wells advised Smart that it was unusual for people who are traveling for two (2) weeks to travel without any change of clothing and personal hygiene items. Cpl. Wells believes that Smart then realized where Cpl. Wells' line

of questioning was headed, because Smart then advised that he would wear the pants he was currently wearing for four (4) days and that he had money to buy new clothes and that he had family in the Philadelphia area where he could get more clothes from. Cpl. Wells advised Smart that it is unusual for people traveling to not bring changes of clothing and to purchase all new clothing when they reached their destination. Smart did not reply to Cpl. Wells' statement.

t. Det. Johns asked Smart if he was currently employed and he advised that he owns a Real Estate and Trucking Company named, Webem Inc. Det. Johns asked Smart the address of his company and he told Det. Johns that he is using his residence address for the company, 111 Coston Lane, Edenton, North Carolina.

u. Det. Johns asked Smart how much money he had in his vehicle and he advised that it was just under $40,000 dollars. Det. Johns asked Smart why he possessed that much cash in his vehicle and he advised that he was planning to gamble some of the money at the Sugar House Casino in Philadelphia and the remainder he was going to give to his father to "hold" for him.

v. Det. Johns asked Smart where he obtained the handgun. Smart stated that he purchased the handgun approximately three years ago from an "old man" in Rocky Mountain, North Carolina for $125.00 dollars. Smart did not know the person's name whom he purchased the handgun from. Det. Johns asked Smart why he possessed the handgun and Smart told det. Johns it was for protection. Smart specifically said that he always carries his gun with him.

w. Cpl. Wells and Det. Johns asked Smart how he obtained the money he possessed in the vehicle. During the interview, Smart was inconsistent with his explanation as to how he obtained the money. Initially, Smart advised that approximately three years ago, his

grandmother and grandfather had passed away and he obtained the money through their life insurance policy. Smart advised that his father was the beneficiary and obtained the money from the life insurance policy, and his father then gave him the money to help him start his own business. Smart advised that he has possessed the money since his father gave it to him. Cpl. Wells specifically asked Smart if all of the money that was in his glove compartment was given to him from his father through his grandparents' life insurance policy. Smart said it was. The majority of the $39,000 dollars that was located in his glove compartment were in twenty dollar denominations. Cpl. Wells informed Smart that the majority of the money was in twenty dollar denominations and asked Smart if his father had given him the bulk of the money in twenty dollar denominations. Smart advised that his father had given him the money in the exact denominations as how they were seized in the vehicle.

x. Smart had asked Cpl. Wells and Det. Johns questions regarding the seizure of the money. Smart acted as if there was nothing wrong with possessing a large amount of money along with Marijuana and a loaded handgun in his vehicle. Smart became agitated when Cpl. Wells and Det. Johns asked him specific questions as to how he obtained the money. Smart said that he could provide proof as to how he obtained the money. Smart went on to say that he can prove that portions of the money came from the real estate company and trucking company that he owns, money that he saved while he was in the military and money that he received from his father. Once Smart said this, Cpl. Wells informed Smart that he earlier advised that he received all of the money from his grandparents' life insurance policy. Smart appeared to be startled by this comment and was unable to provide a legitimate explanation as to his inconsistent explanations regarding the money.

y.  Det. Johns noted that it was evident that Smart was being untruthful as to how he obtained the money and what he planned to do with the money. His story was inconsistent and he became agitated when asked specific questions regarding the money. Also, it was evident to Det. Johns that Smart was being untruthful regarding his girlfriend. Smart advised that he was traveling to his girlfriend's residence in Philadelphia. Smart advised that he has been in a relationship with her for approximately one year and has traveled to her residence approximately ten times. However, Smart was unsure of his girlfriend's last name and her address. Smart wasn't even able to advise as to the street name of her address in Philadelphia.

z.  Det. Johns took possession of the seized $39,421.00 dollars and two cellular telephones from Cpl. Goddard.

aa. On April 28th 2014, Cpl. B. Phillips of the Maryland State Police and Det. Johns counted the money and verified the total amount to be $39,421 dollars. $421 dollars was seized from the center console of Smart's vehicle and $39,000 dollars was seized from the glove compartment. Det. Johns verified this $39,421 dollars were in the following denominations: ninety-seven (97) - 100 dollar bills, Eighteen (18) - 50 dollar bills, one-thousand, four-hundred and ten (1,410) - 20 dollar bills, sixty-two (62) - 10 dollar bills and one (1) - 1 dollar bill. Cpl. Phillips deposited the $39,421 dollars into the Worcester County Sheriff's Seized Funds Account.

bb. On April 28th 2014, Det. Johns submitted a wage history request through the Maryland State Police on Smart through the States of North Carolina, Pennsylvania, Maryland, Virginia and New Jersey. The wage history results indicated that Smart made $275.00 dollars in 2013 in the State of Virginia from ADP Total Source Company.

cc. On April 28th 2014, Cpl. Wells contacted Chief Edward Spencer of the Chesapeake Bay Bridge Police Department. Chief Spencer utilizes a License Plate Reader (LPR) system which captures photographs of vehicles and their license plates traveling north and south through the Chesapeake Bay Bridge Tunnel in Virginia. Cpl. Wells requested Chief Spencer conduct a search of the LPR system for the North Carolina license plate, BKY7070.

dd. Chief Spencer located photographs of the 2008 Honda Accord bearing North Carolina registration, BKY7070 on April 24th 2014 traveling northbound at 1633 hours and again on April 25th 2014 traveling southbound at 1945 hours (approximately 27 hours later). Chief Spencer emailed the LPR photographs to Cpl. Wells.

ee. On April 29th 2014, Smart contacted the Worcester County Criminal Enforcement Team's office phone. Det. Johns answered the call and spoke to Smart. Smart was inquiring as to the status of his Honda Accord vehicle and the U.S. Currency. Det. Johns explained to Smart that his vehicle and money were currently seized and were pending forfeiture. Det. Johns explained to Smart the process and recommended that he consult with an attorney in reference to the matter.

ff. During this conversation, Smart was forthcoming and eager to explain to Det. Johns certain information regarding this investigation. Smart advised Det. Johns that he now knew his girlfriend's last name and told Det. Johns it was Glenn and not Finn which is what he previously advised. Det. Johns asked Smart the last time he had visited her and he advised it was approximately three to four weeks ago, and further stated that is was sometime at the beginning part of April.

gg. Smart informed Det. Johns that the name of his Real Estate/Trucking Company is "Webem Inc. Smart advised his employer identification number is, 46-4380215.

hh. Det. Johns informed Smart that he was receiving a search and seizure warrant for the Apple iphone and the Samsung Galaxy S cell phone that were seized from him. Smart informed Det. Johns that the Apple IPhone was not activated and it was his girlfriends. Smart further stated that he had not been utilizing the cell phone. Smart informed Det. Johns that he had planned to activate the phone within the next few days. Smart had previously advised Cpl. Wells during the interview of him on April 27th 2014 that the white in color Apple iphone was his girlfriend's phone.

ii. Det. Johns asked Smart if he was the sole owner and primary operator of the Honda Accord vehicle. Smart stated he was. Det. Johns asked Smart if he ever allowed other people to drive his vehicle. Smart advised that he has allowed other people to drive his vehicle for short periods of time. Det. Johns asked Smart if he ever allowed anyone to borrow his vehicle for extended periods of time and further asked him if he allowed anyone to drive his vehicle out of North Carolina. Smart told Det. Johns he has not. He advised that if he allowed anyone to drive his vehicle it would be to go to a store or somewhere close by his residence in North Carolina. Smart further stated that he has never allowed anyone to drive his vehicle out of North Carolina.

jj. Det. Johns asked Smart where he was the week prior to Sunday April 27th when he was arrested in Worcester County, MD. Smart stated that he was in North Carolina. Det. Johns specifically asked Smart if he had traveled out of the state of North Carolina anytime within a week prior to him being arrested on April 27th 2014. Smart told Det. Johns he had not, and further stated that he was in North Carolina for approximately three weeks. Smart advised that prior to April 27th 2014, the previous occasion when he traveled out of North Carolina was when he drove to visit his girlfriend in Philadelphia sometime in the beginning of April.

kk. Det. Johns then advised Smart that he had observed a license plate camera reader at the Chesapeake Bay Bridge that captured photo images of his Honda vehicle license plate traveling north on the bridge on April 24th and again south on the bridge on April 25th 2014. Immediately after Det. Johns informed Smart of this, Smart did not respond and Det. Johns did not say anything. There were a few seconds of silence, and Det. Johns then asked Smart if it was him operating the vehicle. Smart said he was not and he seemed to be startled and confused as to what he wanted to say to Det. Johns. Smart mentioned that someone must have taken his car and drove across the bridge, and he further stated that it was not him operating the vehicle at that time. Det. Johns reminded Smart as to what he earlier told Det. Johns referring to no one driving his vehicle for long durations. Det. Johns then told Smart that the photograph of his vehicle clearly shows that he is operating the vehicle. Smart was unable to provide a response to this statement regarding the vehicle and then told det. Johns that he thought Det. Johns was attempting to get information out of him. Smart then changed the subject and appeared that he no longer wanted to discuss the matter of his travels from North Carolina through Maryland. Det. Johns finished the conversation with Smart and further recommended that he consult with an attorney in reference to this matter.

ll. On April 29th 2014, Det. Johns authored a Search and Seizure warrant on the white in color Apple iphone and the black in color Samsung, Galaxy S cellular telephone that were seized from Smart. The Search and Seizure warrant was signed by the Honorable Judge Gerald V. Purnell on April 29th 2014.

mm. On May 1st 2014, Cpl. Wells took possession of the Apple iphone and the Samsung Galaxy S cellular telephone that Det. Johns had obtained a search and seizure warrant for.

Cpl. Wells executed the search and seizure warrant on the two cell phones utilizing a Cellebrite extraction device.

nn. Cpl. Wells conducted an electronic data extraction on the white in color iPhone. Upon reviewing the data extracted from the iPhone, Cpl. Wells observed numerous text messages sent to and from the iPhone pertaining to the distribution of controlled dangerous substance, more specifically marijuana and cocaine. Cpl. Wells recalled that Smart advised that the iPhone was his girlfriends not his; however, while reviewing text messages sent to and from the cellular phone Cpl. Wells was able to establish that this iPhone was in fact the property of Smart. Cpl. Wells observed that a text message was sent from the iPhone advising the recipient of the message that Smart's email address "Trezithsmart@aol.com", another text message was sent stating "Hey dis trey I was calling to see when is pay day".

oo. Some examples of the text messages sent to and from the iPhone pertaining to the distribution of controlled dangerous substance, more specifically marijuana include:

1. Received from K Smiz on February 7, 2014 @ 1236 hours - "Can't mess Wt it bruh u need 2 take it bck"
2. Sent to K Smiz on February 7, 2014 @ 1230 hours – "It's pretty as hell take da sticks out an let me no wat it is"
3. Received from K Smiz on February 8, 2014 @ 1137 hours - "My peep complain sticks I took another 9 g of stick out"

pp. Some examples of the text messages sent to and from the iPhone pertaining to the distribution of controlled dangerous substance, more specifically cocaine include:

rr. Based upon the above text messages, Cpl. Wells knows that not only was Smart in Philadelphia, Pennsylvania on April 25, 2014 when he advised DFC Johns that he was in North Carolina, but that it was Smart who was driving his Honda that was photographed on the Bay Bridge tunnel on April 25, 2014 at 1945 hours. Cpl. Wells knows that Newport News, Virginia is just minutes from the Chesapeake Bay Bridge Tunnel, and based upon the above text messages and the photographs of Smart's vehicle, Cpl. Wells believes that he can say for certain that Smart was in Philadelphia, PA on April 25, 2014 and that he was operating his 2008 Honda that was photographed on the Chesapeake Bay Bridge Tunnel.

ss. On May 2, 2014, Smart called the Worcester County Criminal Enforcement Team office. Cpl. Wells answered the call; Smart introduced himself and advised that he had questions about the storage of his vehicle. Smart asked Cpl. Wells if any storage fees were adding up for each day that passes. Cpl. Wells advised Smart that his vehicle had been towed to a police impound lot and that no storage fees were associated with the storage of his vehicle. Smart then asked Cpl. Wells "did you find what you were looking for in my phones". Cpl. Wells advised Smart "yes", Cpl. Wells advised Smart that he (Cpl. Wells) could read some of the text messages to him. Cpl. Wells read Smart several text message from the white in color IPhone, that were drug related. Smart advised Cpl. Wells "that is not my phone". Cpl. Wells advised Smart that a text message in the phone read "Hey dis is trey I was calling to see when is pay day", Cpl. Wells also advised Smart that a text message sent from the iPhone contained what appeared to be his email address. Smart advised Cpl. Wells "I may have sent a couple of text messages with the phone, but it's not mine". Smart then advised "what about my other phone", Cpl. Wells advised Smart of several drugs related text messages in the Samsung cellular phone. Smart advised Cpl. Wells "those messages could mean anything, it

    1. Sent to Kenny on February 9, 2014 @ 0700 hours - "Wat up cuz I didn't no who u was"

    2. Sent to Kenny on February 9, 2014 @ 0700 hours - "Wat u need"

    3. Received from Kenny on February 9, 2014 @ 0704 hours - "2 soft"

    4. Sent to Kenny on February 9, 2014 @ 0705 hours – "Damn cnt do it it won't b nutn for a min week or two"

qq. Cpl. Wells knows that Smart was in fact operating his 2008 Honda, with North Carolina BKY-7070 on the day of April 25, 2014 at 1945 hours, when Smart's vehicle was photographed traveling southbound on the Chesapeake Bay Bridge Tunnel. Cpl. Wells knows this based upon a review of the test messages extracted from Smart's Samsung cellular phone; these messages place Smart in this same area around the same timeframe. Below are several text messages extracted from Smart's Samsung cellular phone:

    1. Sent on April 25, 2014 @ 1157 hours - "Not to bad im n philly"

    2. Sent on April 25, 2014 @ 1442 hours - "Dats good i mite be cumn to see my sister"

    3. Received on April 25, 2014 @ 1443 hours - "Coming where"

    4. Sent on April 25, 2014 @ 1445 hours - "Va beach"

    5. Received on April 25, 2014 @ 1452 hours - "O thats wsssup thats twenty mins away from me We S"

    6. Received on April 25, 2014 @ 1608 hours - "Where i live in Newport news"

    7. Sent on April 25, 2014 @ 1608 hours - "Oh ok i know whete dat is"

    8. Sent on April 25, 2014 @ 1618 hours - "Well ill b n dat area around 730 8"

doesn't sound like anything to do with drugs". Cpl. Wells then advised Smart that he would be receiving paperwork in the mail regarding the proceedings that will come in reference to his US currency and his vehicle, Cpl. Wells then ended the conversation with Smart.

I DECLARE UNDER PENALTY OF PERJURY PURSUANT TO TITLE 28 U.S.C. 1746 THAT THE FACTS SUBMITTED BY THE WORCESTER COUNTY SHERIFF'S OFFICE AND CRIMINAL ENFORCEMENT TEAM, IN REFERENCE TO THE SEIZURE OF $39,421.00 IN UNITED STATES CURRENCY AND THE SEIZURE OF THE 2008 HONDA ACCORD VIN #1HGCP26498A094823 FROM TREZITH SMART ARE ACCURATE, TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

Kenneth W. Oland Jr.
Special Agent
Homeland Security Investigations

## **VERIFICATION**

I, Stefan D. Cassella, declare under penalty of perjury as provided by 28 U.S.C. § 1746, that the foregoing Complaint for Forfeiture *in rem* is based on reports and information furnished to me by Special Agent of Homeland Security Investigations, and that everything contained therein is true and correct to the best of my knowledge and belief.

_____
Stefan D. Cassella
Assistant U.S. Attorney

4